Our first court case for this morning then is Dolin v. GlaxoSmithKline. Ms. Blatt. Thank you and may it please the court. My name is Lisa Blatt and I represent GSK. With the court's permission, I would like to start with the issue of innovator liability and three reasons why this court should reverse the district court's holding below on that issue. Now by that you mean liability for the brand name manufacturer. That's right. Right. Just to be clear. Yeah, and my first point is the plaintiff has the burden to show that there is a duty by brand manufacturers to the users of generic drugs, yet no Illinois court recognizes a duty owed by one manufacturer to the users of another manufacturer's product. Is that right? It seems to me that in the business world, there are circumstances in which third parties certify the characteristics of a product, for example. And so manufacturer A might sell the product, but certifier might certify it, and then manufacturer B, in this very weird hatch-waxman world where the product has to be absolutely bioequivalent with identical labeling. Right. I mean, the rationale of the other side is that there's a federal requirement that Mylan and other generic companies use the same label when they sell their drug. And, of course, as you well know, you've discussed it in the brief, in the Mensing case, in the Bartlett case, the generic manufacturer can do nothing with respect to the label. The court has been absolutely clear. They can't even exit the market. Well, sort of, but yes. Well, that's what Bartlett said. Yeah, but my point is that the drug that Mr. Dolan took was not made by GSK. It had Mylan's label. It was directed to Mylan's customers. Right, and I guess the question is, why does that matter? Because, clearly, in the world of drugs, federal law places the labeling responsibility on the brand manufacturer. So, in that sense, this suit is only saying that the company didn't do what it was supposed to do with respect to its own label. Right, and the reason why every federal court of appeals to have considered the issue and the overwhelming, I think, 140 decisions by federal courts have looked at it, have said, sure, it's an absolute certainty that the label will be copied, but that stretches the concept of foreseeability too far. Why does it, though? I mean, actually, maybe I should jump you to this point. Sure. There is a disagreement among the state courts about this claim, and at one point along the way, the suggestion has been made that perhaps we should just certify this to the Illinois Supreme Court, particularly since, A, the plaintiff started out in state court. B, we have California taking one position. We have West Virginia and Virginia and some of the other courts taking a different position. Why isn't this really up to Illinois? I mean, why you shouldn't certify, there's three reasons for that, and I recognize it's a prudential decision on your part. The first reason is that there's a specific default rule for tort cases for federal courts sitting in diversity, and that's when you have a novel question of state law. You reasonably restrict liability more than expand it. I think that overstated. What is that? Go ahead. Well, this court has, I mean, why under Erie, but this court has only certified in the last two decades seven cases to the Illinois Supreme Court, and all involved, incidentally, questions of statutory interpretation. But we've also sometimes expanded toward liability under Illinois law with novel questions, if it seems like there are good reasons to do so. I mean, your cases that we cite say there's a hard and fast rule for tort cases that out of respect for the comedy for the state court, you let do it. Hard and fast is not what we've ever said. What we're obliged to do under Erie is ascertain to the best of our ability what we think the Illinois Supreme Court would do. And if we think it's on the brink of taking the next step, then we do that. If we think it doesn't want to, then we do that. We sometimes ask. And remember, the certification statute itself in Illinois only came in in the early 1990s, and so there isn't a very long experience with that. And I think that's a fair point. Let me get to my second and third reason. I mean, certification usually happens when there's genuine uncertainty. And when we have a split in the state Supreme Courts, doesn't that create genuine uncertainty? I'm going to get to this. We have a genuine uncertainty under Illinois law. We actually have an Illinois Supreme Court case, Smith, that at least goes our way and they have nothing. I don't think Smith has anything to do with your case. Smith is market share liability. I think it does, but assuming you think Smith is neither here nor there, the third point is under your rule and the Illinois Supreme Court rule, it's a weak case to certify when there's other reasons that don't depend on state law. So you would be burdening the Illinois Supreme Court when there are multiple grounds here, and I'm not even sure the Illinois Supreme Court rule allows it in your decision that they cite. The State Farm case says you don't certify and you can't certify. We have two issues under Wyeth v. Levine preemption. So you would get to those issues first, and we think we win under those issues. That would take quite some time, and then you would resolve the causation and the duty issue, and then you would certify. So we're talking a lengthy time here. That's not uncommon. I guess on the other side, it strikes me that this is a very important question because of the role that generics play in the market, because of the role that brand name drugs play in the market, because of the number of cases brought about drugs that appear or, for that matter, devices. But anyway, drugs that appear to be unsafe or need better could hardly affect more of the economy. Judge, I couldn't agree more. We think innovator liability would be catastrophic. It's definitely California is the only court that's gone completely whole hog towards liability. All federal courts of appeals have said no, no, and more no because it would totally upend the pharmaceutical industry and the three decades of reliance interest. But, you know, the interesting thing about that argument to me is when I reread this morning Wyeth and Mensing and Bartlett and the other cases, the Supreme Court doesn't hesitate to say, well, we realize that this is a tough ruling for a very sympathetic plaintiff, but we have to go where the law takes us. And if Congress wants to change the law, be our guest. And I don't know why that's not a two-way street. I mean, I think this would have been unthinkable and anathema to Congress that passed Hatch-Waxman that the manufacturer would insure the entire market, and this would be an extension. Only as to the label. Sure, to be sure. And it would be an extension of Smith. But if I can't convince you on Smith, and we do think we have, even if it's not on all fours, it's certainly on all threes because Smith involved the identical question here of whether to recognize a duty to another manufacturer. No, but that was when no one knew who manufactured the drug. And we know that the defendant here didn't. And also, I mean, so that counts in our favor. We know who has the duty to create the label. I guess that's the. Absolutely. And so what the Illinois Supreme Court said was the drug manufacturers could reasonably foresee when they sought FDA approval of a drug that caused birth defects, they could reasonably foresee that other manufacturers would not only enter the market but with the exact same design and the exact same label. And the court said only there's a duty. I mean, I'm just quoting from the opinion. It's only a duty to your own customers, notwithstanding that the plaintiff would be left without a remedy because the desire to create a remedy for an injured party was outweighed by just the potential that the added exposure would reduce innovation and life-saving drugs. And we think we have that in spades here. But if I can't convince you on that, I mean, I don't think I could. I don't think you're in a position to certainly say Illinois law would when the only thing you have on point says. No, I don't know what Illinois would do. So then I can turn to the other issues, which I do think you have to address, and that is we have two independent reasons why their failure to warn claim is preempted under Wyeth v. Levine and its progeny. The first argument on that is that under the Supreme Court's decision in Mensing and this court's recent decision in Gilbo, GSK could not have changed the label unilaterally because it lacked newly acquired information. So I wanted to ask you about that. Because in Wyeth, the court actually considers the breadth of the phrase newly acquired information. And it says it doesn't need to be brand new data. In fact, it includes new analysis of old data. And I think that was never – I mean, I have a couple of concerns about this part of your case. One of them is it seems to me that the FDA and your client were talking past each other, that nobody really knew what was on the table. The FDA is saying we don't want the class-wide SSRI label to be different. You're trying to say, oh, never mind about all of the SSRIs. Let's just look at Paxil. So there's a failure to communicate. But there's also the possibility that Wyeth v. Levine opens up. This is a quote, page 569, new analysis of the existing data. Right. So putting aside, I mean, I couldn't disagree with you more on they were talking past one another. But that goes to clear evidence. Our point, which is completely independent, is did GSK, after the FDA, and the other side doesn't dispute this, mandated a labeling change as of August 2007 that disclaimed any suicide risk for adults, page after 24. And you see right on it is what new information, meaning new analysis of old information. They don't point to anything except a 2008 article that was published in 2010 that is identical, word for word, verbatim. It couldn't be more closely one big mirror of what was given to the FDA in 2006. So they left you with nothing. They actually have no response to this. They're not going to be able to cite new analysis of old information. There's old analysis of old information. FDA had everything. To this day, Judge Wood, that label still says the exact same label on Paxil, and there is no new information. Your suggestion is that the current manufacturer is also liable because they've had new information too. FDA studied this issue exhaustively for years, including this very same information in that 2008-2010 article. And they just don't have a response on this except to try to muddle it and confuse you that this is a clear evidence issue. The only dispositive fact is there is a statutory federal requirement that Paxil carry this label. It's still that requirement today. That label has to disclaim a risk of suicide risk. There is not a single manufacturer alive that can change that label unilaterally. And what I mean by unilaterally is not going to the FDA and saying, can we change your mind. No, I know. You're talking about this CBE process that your client went through for a while, and then the FDA thought about it, and they said no. And then we have this exchange of communications between the FDA and GSK that I find ambiguous. So even if you find that ambiguous, that all goes to could we have convinced the FDA to get our permission to change it. Right, if you had sat down with them and said, oh, let's make sure we're all talking about the same thing. Right, which I think they have a terrible argument. But even if they were right on that, they have to show you that we could have called the printer without asking FDA's permission, printed out a new label, put it on the packaging, no prior heads up. The mere fact that they've been arguing about what we should have and could have and might have told FDA in a meeting just proves our point. We had to get FDA's permission to change it. They have to prove independently that we were lawfully able, and still, that the current manufacturer would be lawfully able to change the label. And they can't. And I think the FDA's brief on this is very positive for us. They just don't have an argument, which is why they buried it in their brief. They really want to talk about what the FDA might have done. And that's not the issue. It's what GSK could have lawfully done, and they would have violated federal law, and so would Apotex or whatever they're called now. They are illegal. They would be acting illegally if they called up the printer and changed the label of Paxil. So despite all of these suicides of people in the higher age range, above the age of 24, I'll say, it's your position that there's no suicide risk. So let me just turn to that. It is the FDA's position. All the data that they've relied on was in front of the FDA. They did a 2006 meta-analysis of 100,000 patients, 372 clinical trials, including Paxil. Paxil was the main drug at issue. So it is mind-boggling that they would say that FDA wasn't looking at Paxil. Paxil was the one they were worried about. And they say in their meta-study, yeah, I see these Paxil numbers, but that is scientifically not relevant because it could be chance, and we're discounting it because of the number of comparisons. But isn't it clear that your position was that the science did warrant a more explicit warning, right? Our position was we had all those disclaimers. Our position was more information is better. So we tried to put in the information about there was a risk, and they were in the attempts. And this is our point on that. You said a moment ago, counsel, you were talking about what plaintiffs had to prove regarding this issue. I had understood the federal preemption theory here to be an affirmative defense. And I'd like to have you address the problem of how that was presented by you to the court, to the jury. Who's the decision maker and on what evidentiary record? Oh, sure. So we think preemption is a question of law for the court. The Third Circuit has disagreed and held it a fact question. That issue is an appending petition. The federal government in their recent brief, I mean, gave 19 different reasons on why it's a question of law. I think it's a standard federal preemption question, what it administers. It doesn't depend, though, here, for example. At least you're arguing that your preemption defense is much stronger, given the evidence of the back and forth that you had with the FDA, right? Sure, but let's keep this straight. We have two independent arguments. The first issue on newly acquired evidence, we've met our burden. There's a federal law that's called the label that's mandated, and we've said there's no new evidence. They say, well, there's an article. That's all they cite after August 2007, and we're telling you that there's a table that's identical. It's just a classic legal question, like construction of a patent, or was a confession voluntary, or was there probable cause, or did you waive Miranda rights? All these things are legal questions, yet they can turn on historical facts. The second issue, which I think you're going to, is hypothetically, what would the FDA have done? What if they rejected the label that they suggest? And we have the correspondence that I can get to, and we also think that's a paradigmatic, quintessential legal question for the court. In terms of how that played out at trial, the judge proposed a charge to the jury. We objected, and the plaintiffs have always said that this is a legal issue. They don't think it's a fact issue either. First, we think it's a legal issue, and second, we don't like your instruction. We proposed our own instruction that was just a verbatim quote under Wyeth for the clear evidence. The court rejected that. So we think it was properly preserved, but I don't think this is complicated on the legal question. If I can get also, again, I don't think they have a response on the newly acquired evidence. I also think it's devastating on the clear evidence, and I get what they're trying to say. They say, you know, we could have put it in a different place. We should have met with the FDA, and, you know, your warning wasn't clear enough. The problem for them is that the timeline is unambiguous in that the FDA would have rejected any, any and all Paxil-specific warnings because the label they want was the opposite of what FDA had concluded about Paxil. The label warning they want is that Paxil increases the suicide risk for adults of all ages. FDA looked at 100,000 patients, Paxil specifically. It's cited on the reply brief at page 24 and said, we discount the Paxil data. We want to disclaim that. They, on three separate occasions, said unambiguously that we are rejecting. You have to take out the Paxil warning. You have to put in our class warning, which is a warning to Paxil patients that SSRIs do not create suicide for one reason and one reason only. They wanted a consistent, universal, standardized warning that disclaimed suicide risk for all SSRIs. Again, Paxil, their argument was that it was the highest blip. So the notion that they, you know, didn't look at Paxil is just not plausible. Well, I can certainly see why they wouldn't want the class warning to overstate it, but if a particular drug had an extra problem, you know, so everybody's free to take all the other SSRIs with less concern, but maybe Paxil, the doctors want to take some extra steps. Judge, that just doesn't work, and the FDA's brief is just devastating on this, and it doesn't work for three reasons. One, I just told you they looked at Paxil, and on the merits said no. No, we don't like the plaintiff's argument. They testified at that advisory committee meeting. We don't think Paxil creates that risk. Second, what they want is even worse. They wanted a warning that said it's one thing to say SSRIs, all good, but maybe this one presents different risk. They want a warning about suicide saying SSRIs don't present a suicide risk. And then somewhere else, could have been, you know, on page 10, it could have been on page 1, Paxil presents a suicide risk that we just told you the drug you're taking didn't. But SSRIs are not identical. What would be the point of patenting each one? They did 100,000 patients, 372 clinical trials, like eight or nine SSRIs and antidepressants. Paxil was one of the leading ones. And you're not claiming they're identical drugs. Of course not. We're claiming that the FDA individually concluded no risk, no risk, no risk. We want all patients who are depressed not to take these medications because of a fear of suicide. And let me get to the third point, and, again, on the FDA's brief. Their argument, and your argument, too, what your suggestion is, is that the FDA acted illegally, irrationally, and bizarrely. The law is absolutely clear. If there is any causal association between a risk and a drug, the statute and regulations require the FDA to sit down with the manufacturer and craft that warning. The FDA can't reject it because it was worded wrongly, it was in the wrong place. Now, my recollection is that there are some criticisms of some of the studies that GSK presented to the FDA and invited the FDA to rely on those studies, that those studies themselves had some problems. Sure, and that was cleaned up by 2001. Again, their problem is that this suicide was in 2010. So I understand that they want to make GSK look bad, and the study can look at all kinds of things. That's not what they're doing. Please, let's not. Well, it is nonsense in this sense. They have to obfuscate because there is a label, a federal label, that says SSRIs don't present a risk. We lawfully couldn't change it. It would have been illegal. And then on the new evidence and what the FDA would have done, FDA had all the information. I don't know what would have happened at the so-called meeting that we were supposed to suggest. They had already said, we looked at your data, we want the same warning. They said it four times over, the May 1, May 7, June 21, and June 22. We want a consistent, standardized, universal label. They were done and over with. So I just don't know what would have happened at this meeting, except, you know. And again, that doesn't, they still have the problem with, we would have been begging for their permission. And I do think it's bad for them that the label still says this. And this issue was one of the biggest healthcare crisis starting in, I think, 2003 when the pediatric data came out. It was a massive public controversy. The FDA was very concerned on this. They were focused on the specific issue. Suicide is obviously a very serious issue, and these drugs are designed to help people who are depressed. So it's not like the FDA was treating this casually. And Paxil was one of them. So, you know, I think they have a problem. I don't know if I'm into my rebuttal. You are. Okay. If you'd like to save some rebuttal time, that would be fine. Thank you. Mr. Wisner. Good morning. May it please the Court. Brent Wisner on behalf of the Applee Wendy Dolan. I had an introduction prepared, but I actually just want to get straight into preemption since that seems to be where we ended off the last part of the argument. I want to be clear. The FDA has not submitted any brief in this case that I'm aware of. So I believe the brief that opposing counsel is referring to is a document that was prepared by the FDA where they summarized their scientific conclusions about SSRIs generally. So I would appreciate it if you could maybe start where Ms. Blatt left off and talk about GSK's efforts to change the label in the mid-2000s and FDA's ultimate decision that it didn't want those changes to become the standard part of the label when it files the CBE. Absolutely. So we know in 2004 the FDA learned that GSK had been hiding specific suicide risks related to pediatrics. That prompted a widespread concern within the FDA that all SSRI manufacturers were doing the same thing. At that point they requested all the pediatric data, and they initially had a label issued warning about pediatric suicidality. Subsequent to that, the FDA said, okay, we now want every manufacturer to give us all of their placebo-controlled trial data related to those. Which is a subset of the data. I mean, if the FDA wants placebo-controlled data, then that's what you have to give them. That's the gold standard. Absolutely. During trial we actually learned, however, that GSK was aware of a considerable amount of placebo-controlled trial data that they never shared with the FDA. And this is important because in the data that GSK ultimately did give to the FDA. Is this done, I'm trying to remember, at sort of a more local level somehow, these other studies? That's correct. GSK, there's GSK, the main company, and then there's GSK France, GSK New York, a bunch of different smaller companies that conduct local clinical trials. They're placebo-controlled, fully protocoled, the way a normal clinical trial is done, but GSK and its centralized database didn't have that data. And this is really important because they reported to the FDA a single adult suicide in the placebo-controlled trials.  So the data they gave to the FDA was itself deficient, and that's clearly in the record. But that said, they reviewed the data that they submitted to the FDA, and in 2006 concluded, oh, we have a problem. So they changed the label. And they did that uniformly, and they added this risk information. That's under the authority to do it quickly and unilaterally, right? Exactly, under the CB, correct, Your Honor. Right. At that point, the FDA didn't stop them, didn't say take it off, or we have a problem with it. It was on the label for about a year. Then in 2007, the FDA issued its analysis. And in its analysis, it was analyzing all SSRIs. It did not analyze a single SSRI. But did it have this individual data at that point? It did. On page, I believe, 19 of the document that's called the Stone-Jones Report, it's what we refer to in a trial, the document specifically listed every SSRI and the risk ratios and whether or not they were statistically significant. Two of the SSRIs had an elevated risk. One was Paxil. The other one was, I believe, Lexapro. The only one that was also statistically significant was Paxil. So it was the only one that had a statistically significant risk. Now, this confirms, and that was for all psychiatric conditions. The initial analysis done by GSK was just for MDD. So this confirms what they already knew in their 2006 data, which, as we have shown at trial, confirmed what they knew back in 1989 when they originally were submitting the drug for approval. So this shows a consistent knowledge that GSK, in fact, knew that there was an increased risk of suicidality, and there's a consistent practice of misreporting that to the FDA. In 2007, when the class-wide warning came out, the FDA was trying to implement warnings for about 40 different manufacturers. GSK was one of them. Amongst those manufacturers who manufacture all sorts of antidepressants, not just SSRIs, but tricyclics, a whole host of other things that were studied in that meta-analysis, they said, implement this class-wide warning immediately. That was the predicate for when GSK responded with an email and then a formal letter saying, hey, we think that the Paxil information should be in there. They proposed putting it smack in the middle of the class labeling. The FDA finally said, well, no. So is it your position, then, that that warning, as I was saying with Ms. Blind, it's a concern of mine, that that warning didn't belong in the class warning, but it did belong as some sort of Paxil-specific, for all I care, Lexapro-specific, that's not before us, but particular warnings? Precisely. So what was GSK supposed to do when the FDA says, I guess June 25, 2007, we do not believe that your product-specific analysis should be included in class labeling revisions? They should have proposed putting it not in the middle of the class labeling provisions. On cross-examination of GSK's company witness at trial, I asked him, quote, nowhere have you pointed to this jury a document that says you are prohibited from putting any Paxil-specific information anywhere in the label. The FDA never said that, did they? His response, they didn't say that. And then I clarified, I go, doctor, you told this jury that proposing Paxil-specific language is futile, but you never even once tried to put it anywhere in the middle, but in the middle of the class labeling. Isn't that true? That's true. How many times did FDA say no to Paxil-specific labeling? I don't believe they ever said no to Paxil-specific labeling. I believe they said no to putting Paxil-specific labeling one time in the middle of the class label. So your theory is that GSK just didn't ask exactly the right question of the FDA? The FDA said we'll only answer the questions that you ask us? I believe that there was a bit of talking past each other going on between FDA and GSK. I think that the FDA said, listen, we're implementing this class-wide labeling. We're not dealing with individual changes to it. It's being implemented. If you want it elsewhere, let's talk. Does they ever define what class-wide labeling is? What's in the class and what isn't? Is that anywhere in the record? The definition of a class label is actually a regulatory rule that specifies what class labeling is. And what does it say? I don't have it in front of me, but the class-wide warning label is just that it gives the FDA the opportunity to implement labeling that will be applied across a class of drugs. It gives it the authority to do that. So all NSAIDs, all SSRIs, all certain types of drugs. That's right. Now, we had an FDA expert, a former director at the FDA, who was there for 10 years, who said very frequently manufacturers add drug-specific information to class-wide warnings. He actually gave examples of it. And that trial, over the course of two hours, he specified 11 different locations. GSK could have put Paxil-specific information that would have been consistent with FDA regulations and would not have rendered it misbranded. At the end of the day, when we're talking about preemption, GSK bears a significant burden. They have to show clear evidence that the FDA would have deemed Paxil misbranded if they warned about an adult suicide warning. That's the standard. And if they haven't proved it by clear evidence, if it's ambiguous, then they lose as a matter of law. And the jury gets to hear the evidence. There was a considerable amount of testimony on this issue, and they argued it to the jury. In fact, the jury asked several questions about the various FDA correspondents during its three-day deliberation, and ultimately GSK lost on the facts. One of the issues that wasn't addressed, and I believe it's an important issue, is the standard of review for preemption. We've argued that it actually is a clear error standard insofar as there's... But that seems so counterintuitive to me. I mean, preemption is a question of what's the scope of the state law, what's the federal law cover. It sounds a lot like a question of law to me. It could be a question of law for which there are some historical facts that are going to feed into the ultimate determination. But it's inconceivable to me that you would have a court in Illinois saying that there's federal preemption based on the facts before that court, and a court in New Mexico saying, well, here we don't find preemption. Well, I agree with you insofar as we're interpreting a constitutional provision, right? The Supremacy Clause. And statutes. We're interpreting, well, and more general, the common law of Illinois, or as it happens, Illinois here, negligence, the food and drug statute, and the Supremacy Clause. These are legal questions that courts decide as a matter of law. Yes, except for the Levine preemption. While there is a lot of legal issues that all would be subject to a de novo review, there are factual findings, because the Levine preemption that they're asserting requires a showing of clear evidence. And there has to be a finding by a trier of fact, whether that's the court or the jury, that in fact there is that evidence. And once you start talking about communications, emails, testimony by their own company witness, testimony by experts, you are now weighing evidence and making a factual finding. I don't, well, maybe you should be more specific. I can certainly see in Mensing and in Bartlett, for example, the court saying the legal structure here simply does not give the kind of room for the generic manufacturers to change the label that would be necessary in order to hold them liable, either as a matter of negligence or as a matter of product liability or any other sort of liability. And Bartlett, you know, they sort of underscore that holding and say it's not a good answer to say, well, you could just leave the market. So those look to me like analysis of the statutory structure. Correct. And in those circumstances, there was no disputed issue of fact. So here, I mean, in our case, we have, what you're basically trying to do is you're trying to focus on the one duty, the duty to provide an adequate label such that the drug is not, quote-unquote, misbranded. And obviously, when it first comes to market, there's a label that the FDA has approved. There's a process for review. There's a process for change. All of that lies in the hands of the brand name manufacturer, and it's specifically excluded from the generics. So we have to decide, does that mean that if there's a bad label, the brand name manufacturer has the burden of addressing that problem, no matter who actually, in a sense, was its agent manufacturing the product? I think that's correct, and that's getting into the label immunity, which I'm going to transition to in just one second. I would just point out that in Y3 Levine, the seminal case here on brand name preemption, which is the preemption being asserted by the defendant, it stated, actually, it referenced the trial court and the Virginia Supreme Court's factual determination. Specifically, it stated that both the trial court and Vermont Supreme Court rejected this account as a matter of fact. And then it went on to say, notwithstanding the evidence that Wyeth had presented that the FDA would have rejected it, it went on to say, we accordingly cannot credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning. Inherent in the Levine decision is deference to a factual determination made by the trial court. And I think that that's clear in Levine, and listen, I understand the idea that it's easy to decide it, but ultimately, Judge Hart and Judge Zegel both made factual findings about what happened. But they're talking about a legal structure. It's a little odd to me that that's not what you're relying on. The legal structure allows the FDA to take into account not just newly acquired information, but new analysis of old data. And so the FDA's hands are not tied if further investigation shows that either a particular drug or perhaps a class-wide label or something else should be changed. Absolutely, and in fact, brand-name manufacturers have a very broad discretion to implement the CBE regulation. I think Wyeth v. Levine makes that clear. And one of the things that was interesting in Wyeth v. Levine is 20 adverse event reports that had occurred over 20 years. That was enough, because they could have looked at it to change the label. So this new evidence rule that's being espoused as an argument here for preemption really doesn't work out. I mean, we presented to the jury, I think, 28 different adult suicides in GSK's clinical trials. One by one, we went through the date, time, how they killed themselves. And I think that's an evidentiary basis for saying that they could have changed the label unilaterally, even after 2007. Okay, so what I think... Even after the FDA says don't. I guess I'm just stuck on that. Sure, but what did they say no to? They said no to putting that language in the middle of the class-wide warning, and in the same paragraph say, let us know if you want to put it elsewhere, or let's discuss alternatives of what you want to do. GSK simply didn't take that meaning. So your position is the FDA was afraid that if you stick it in the middle of the class-wide warnings, people will think it applies to all of the SSRIs instead of just Paxil? Absolutely. I actually don't know what the FDA was thinking, but that's a very good reason why the FDA might have thought that. I think it's telling that my opposing counsel stated, I don't know what would have happened at that meeting. That is not clear evidence. I mean, it's an admission right there that they have not met their affirmative defense burden. At that point, preemption should be rejected. So on this record, at least as it's been presented, I don't believe preemption stands. So let me ask you, if you could, because what Ms. Blatt says about certification is that one wouldn't certify if there's an independent reason anyway to rule on the case one way or the other. I think that makes a lot of sense, of course. And we've been discussing the FDA's particular actions on the labeling. There are other theories that they have as well about why this wouldn't be the case to throw this over into the lap of the Illinois Supreme Court. Maybe you should talk about that. Sure. The last two grounds that GSK seeks reversal, the first relates to whether or not we presented evidence of general causation. And to be clear, we presented three different expert witnesses. And Judge Zagel approved them through Daubert. And that Daubert ruling is not on appeal. So the issue before the court is actually three admissible expert testimony in all the clinical trial data, peer-reviewed literature, and non-peer-reviewed literature. Is that sufficient from which a jury could conclude it causes suicide in adults over 25? And I submit that it is. It's not a particularly controversial idea. We're not the first case where a jury has concluded that, for what it's worth. There was another trial in 2001 where another jury concluded Paxil caused suicide and actually homicide in that case. So this idea that there's no evidence that it causes suicide in the face of expert testimony doesn't seem like it really gets very far. Let me ask you about the doctor who prescribed this, whose testimony I can charitably refer to as all over the block. You know, he says one minute that had he realized that there was a suicide risk for a man of Mr. Dolan's age, which as I recall was about 55, he never would have prescribed it. Then he turns around at another point and he says, oh, you know, but I knew all about suicide risk in adults. I saw this old warning. And then he turns around again and he says, you know, I would never have prescribed it. So what do we make of this? Because we do have a learned intermediary here. It's a good problem. It's a good question. The issue is Dr. Sackman, the prescriber, got confused during cross-examination. That's simply what happened. If you look at the actual record, the questions asked of him were a paragraph each, and it went on for I think almost two days. It was relentless. And they kept asking questions about the risks associated with depression and anxiety. And everyone knows that depression and anxiety are themselves associated with suicide. And he kept answering questions about that. But then they would slip in something about an antidepressant and he wouldn't catch it. And so that's why I'm redirecting, clarifying with him, hold on a second, did you know that Paxil itself could cause suicide? He said no. And then he said if I had known that in 2010, I wouldn't have prescribed it. But then didn't later on he say that he has some patients who are doing well on Paxil, and despite this risk of suicide, he would keep on giving them the Paxil? And Mr. Dolan was one of those people. He had had Paxil before. Yeah. But he also testified that since he's now learned of this, he hasn't issued a single prescription for Paxil because he now knows. So it's a little different when you're starting someone, initiating someone on antidepressant therapy. We know the greatest risk is in the first few weeks. It's very different when someone's been on it for two years and has habituated that side effect. There's really no reason at that point to take someone off of a drug that they're already doing well on. That actually would be against the standard of care. And he testified to that. He explained that on the stand. But ultimately at the end of the day, when a jury is presented with potentially conflicting testimony, that's why we have juries. They figure it out and they decide which aspect of the testimony they want to believe and which ones they don't. And GSK, in their two-hour closing argument, devoted 50 minutes to this specific issue. I mean, they went on and on and on, and the jury just didn't agree. So the question before this court is, is there any evidence that they did make a difference in his prescribing decision? And there clearly is evidence in the record. With that, you can't disturb the verdict. There's no reason to do that, notwithstanding the fact that there is some conflicting evidence. And it was a big issue at trial, something that we lost sleep over. But it's ultimately something that the jury decided. And I don't think at this point it needs to be reversed. Turning to the label immunity issue, one of the cases that we cited in our brief and discussed at length at different points was the Happel decision, an Illinois Supreme Court decision. It was not addressed whatsoever in the reply brief, nor was it addressed in the opening brief, and it still is actually unaddressed. The case is particularly helpful because it showed that a duty to warn can be ascribed to a non-manufacturer. In that case, it was a pharmacy that was filling a prescription for a customer, and there were two different drugs being filled that were contraindicated. And because the pharmacy had known and knew about this risk, the Illinois Supreme Court said you had a duty to warn, even though they didn't manufacture the pill. They had a duty to warn their own customer. That's correct. That's correct. Can I ask you, Mr. Wissner? I'm struggling with this. We know that product liability has enormous policy implications, terribly important for public safety. We know that brand manufacturers, brand name manufacturers, have ample incentives. There are financial incentives to develop new drugs that can be incredibly profitable. There also are financial incentives to avoid tort liability. At least as I understand the way drug markets work at this point, the theory that you all are relying on here would impose approximately, on average, a tenfold increase in exposure for brand name manufacturers on the theory that 90% of all prescriptions are filled by generics. What marginal benefit for public safety do you see from that tenfold increase in exposure? Well, I disagree respectfully, Your Honor, that it's a tenfold increase. What do you think it is? I think the exposure is based upon fault, right? The theme... No, but just the sheer number of incidences. I don't see how you can disagree with that part. And these numbers may even be wrong, but roughly, if after generics are in the market, the brand is still capturing 10% and the generic manufacturers collectively the other 90. Right now, or at least in a jurisdiction where the state tort law is in Virginia or West Virginia, right now the manufacturer is paying tort liability for its market share. Your system would have it add on the other 90%, and then you'd have to get into incidents of problems and so on and so forth. Fair enough. There's two quick answers. The first answer is there are regulatory provisions that allow an NDA holder to withdraw from the market and no longer control the label. Why isn't that a Bartlett issue? And who is then responsible for the labels? At that point... So the reason why it's not a Bartlett issue is because it's not about conflict preemption, and we're not saying that they have to withdraw from the market to avoid exposure. I'm just saying it's a policy issue of long-term tenfold increase. They can actually mitigate that by withdrawing from the market or selling the NDA. To answer your question, Your Honor, no one, actually. Nobody takes on the new responsibility? No, the FDA then becomes sort of the owner of it. It's called an orphaned NDA. It's actually the vast majority of generic drugs actually are that today. Penicillin, no one owns the original NDA for that. It's an orphaned NDA. And so there is a way to limit exposure if you want to be... By withdrawing from the market. Correct. That seems like an extraordinary... That's why I call it the Bartlett problem. These drugs, yes, there are dangerous side effects, and there are people who will suffer enormously who use them, but they also produce some great benefits. And if your answer is, well, you should just withdraw from the market, that's a pretty troubling answer. That was my short answer. Okay, go ahead. The longer answer, and I think the more compelling answer, is that they're not an insurer for the industry. They're only an insurer for their fault. An insurance company... So let me just maybe help you out or at least tell you how I'm thinking. Sure. I can think of a lot of lawsuits against generics that would not implicate the brand name person at all. If you had bad sanitary conditions at your plant, if you were using unsafe distribution methods, if you, in some sense, as the generic manufacturer, were doing something wrong with the manufacturing process, there's no way you're going to sue the brand manufacturer. It's not their fault. It's not under their control. Clearly, that lawsuit goes against the generic manufacturer. You're looking at this one funny thing. Actually, I think you could probably sue the generic manufacturer if, despite representing that it's bioequivalent, it turned out that it's not. So that's off the table. You're focusing only on the label. Correct. And that's what I was getting at, and that is the negligence and the repercussions for that negligence are at the point of prescription because the label causes the prescription. And if the label is faulty because of negligence, and after you prove causation and damages and all the other elements of negligence, then the brand name manufacturer is on the hook. But to suggest that all 90% of generics are going to increase the exposure tenfold is not really fair. Fundamentally, the reason why is because by the time a drug goes generic, typically it's been on the market for a while, so we're familiar with the risks. Your amici, however, are telling us that there are tons of risks that don't appear until after you get into the generic phase of the market. And that's one of the reasons why it's really important and absolutely essential that the brand name manufacturer have a reason to update the label. If there is no reason, and they're the ones doing the biomonitoring, then you really are pitting two public interests. The reason that they have is because they're still manufacturing the product and selling it and facing liability for harm to their own patients, right? So that goes back to my question. What's the marginal value of the tenfold increase in exposure? Well, I don't think it's a tenfold increase, but assuming it is, the marginal value... It's a tenfold increase on average for claims based on label information, right? That's correct. I'm not interested at all in manufacturing defects, in those kinds of problems. That's just not this case. I'm sorry I'm over time now, but the marginal benefit that... I don't think it's marginal, okay? I mean, people are dying taking this drug, and we have to pit the public policy interest of safe drugs against a drug company's profits. And people who have depression that's untreated by drugs commit suicide. Sure, but those drugs are not going anywhere. And the idea that brand name manufacturers who are making billions and billions of dollars each year by profit are going to be disincentivized to develop new drugs, I understand the concern, but it's a boogeyman. California has had this for ten years. It's the largest drug market in the country. They can't cite a specific example of a drug that was not allowed on the market because of it. I'll stop now, unless you want me to address the certification issue. No, no, no, that's fine. Thank you very much. And Ms. Black. Thank you, and may it please the Court. Judge Hamilton, you hit it. If a drug manufacturer abandons their NDA because the game is just not worth the candle, there's nobody that has the infrastructure, the experience with the drug, to collect and monitor the safety information. This case, GSK was selling Paxil. It had 1% of the market when Mr. Dolan took Myelin's paroxetine. So it's a massive. And their incentive, obviously, is they have been sued for patients who took Paxil. It would be disastrous. And they're the only ones, not only with the duty to update it, they're the only ones with the ones who can change the label unilaterally. So if there's new information, new safety threat. Penicillin, I think, was around when I was born. These antidepressants are much newer drugs. So I don't think penicillin is such a great example. On the new evidence point, he really didn't have anything to say. He said we counted 28 adult suicides. I think those were all in the 80s or 90s. And an adverse event wouldn't be the type of new evidence under the regulation. It has to be new evidence that suggests an increase in severity or a different type of side effect. It can't just be, hey, I heard somebody on the street said something was wrong here. It's got to be something that would allow you to change the label. On the preemption question, whether it's a try or a fact, there was no factual finding to defer here. The only factual finding is that it's undisputed. The FDA said, please don't call us anymore. You can set up a meeting if you want. No one disputes that that happened. And they also conceded below it was a legal issue. On their argument about this class-wide labeling, it could have gone anywhere. A class is just the antidepressant class or SSRI class. And so the whole study was on the class of drugs, including Paxil, no increased risk. Their expert, Dr. Ross, the FDA's brief makes his testimony look downright silly. He says anywhere- You're referring to the FDA brief? So the FDA brief is a brief just filed in the United States Supreme Court in a Merck v. Albrecht case. So you have it. It was just filed maybe on Friday. I don't monitor the Supreme Court brief filings in other cases. So what are you talking about? Sure. So we submitted it to you in a 28-J letter. It's a very lengthy brief because the Supreme Court called for the views of the federal government, the FDA, on two issues. Judge Hamilton, the first issue was is preemption under the clear evidence standard a legal or factual issue? And the government said it's obviously a legal issue. The second one, which is directly- both of these are directly relevant to our case, is what the plaintiff argued there was the drug company messed up because it proposed the wrong label, and FDA could have- you never know what FDA might have done. And FDA said, are you kidding me? We cannot reject a label based on a problem with deficiencies or form. If there was a risk that it can be on a label, we have to tell the manufacturer to put it on the label. So it does render their argument laughable. It also says if it's a warning, it goes in the warning section. You don't talk about a suicide warning on the label, and then when you're talking about, you know, I don't know, whatever you're talking about, something else with the drug, you start saying, hey, by the way, this also produces a suicide risk. And the FDA- But this does get back to the point I was worried about before. According to what I understand you'd be saying, there's absolutely no distinction in terms of risks among any drug in the SSRI class. They're all the same. So there's distinctions in terms of risk. The FDA noted that- And nothing worthy of putting on the label. Exactly. And didn't ask them ever to say, even though SSRIs in general pose the following characteristics and risks, here's something that's Paxil-specific. That was identical of the CVE. That's the- But the FDA said don't put it in the class warning. Because three times they said this. Don't put it in the class warning. No, we want the standard warning for all SSRIs to be the same. And that's completely consistent with what I'm saying. If there's a standard warning for all SSRIs, then that's the standard warning. Don't muck it up. Including Paxil, which is the drug that was part of the leading study. It's like saying we studied Toyota and decided Toyota, Honda, and Mercedes don't present a risk. And we don't think they present a risk, but now we're going to tell you Toyotas present a risk. They decided- And what if we found out that Toyotas happen to have a sudden acceleration problem when the other cars don't? Well, there are a whole lot of things that are the same among them, except Toyotas have a sudden acceleration problem. All the sudden acceleration was before the FDA, starting in 2001 all the way through 2007. Their whole argument on why Paxil's so bad for you is the FDA's conclusions. And the FDA said don't put it on the label. We want everyone to hear that SSRIs do not, or the studies do not show that risk. They say it's a statistical significant- And you're denying to this moment that there's any evidence to show that there's a risk, an enhanced risk of suicide in the adult population. Yes, there's statistical significant findings of all the things that they said. But the science manual says it doesn't show even an association. In other words, you can roll the dice and it can come up something, and you can get a finding of something, but they still said no, it doesn't go on the label. Okay. Thank you. Thank you very much. Thanks to both counsel. We'll take this case under advisement.